**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 26-cv-3601

RICKY FACKRELL

      Plaintiff,

v.

THE UNITED STATES OF AMERICA

      Defendant.

---

## COMPLAINT UNDER THE FEDERAL TORT CLAIMS ACT

---

1.     Ricky Fackrell, by and through his undersigned counsel, brings this action against Defendant United States of America pursuant to the Federal Tort Claims Act (the "FTCA"), 28 U.S.C. §§ 2671–2680.

2.     Mr. Fackrell is in the custody of the Bureau of Prisons (the "BOP"). As his custodians, employees of the BOP owe Mr. Fackrell non-discretionary duties of care. But between the months of August 2023 and February 2024, BOP employees repeatedly and flagrantly breached those duties, and their actions and inactions nearly cost Mr. Fackrell his life and have left him disabled and in constant pain.

3.     In summer 2023, while incarcerated on federal death row at the United States Penitentiary in Terre Haute, Indiana ("USP-Terre Haute"), Mr. Fackrell began experiencing vivid hallucinations, psychosis, difficulty drinking water, difficulty urinating, and significant weight loss. His condition was so alarming that his fellow inmates contacted their own attorneys to report it.

4.     But despite interacting with Mr. Fackrell more than fifty times a day, every day, BOP staff did nothing. While corrections officers later told healthcare providers that Mr. Fackrell had been exhibiting these obvious and alarming symptoms

since at least August 10, 2023, there is not a single clinical note or medical record indicating medical care was sought for or provided to Mr. Fackrell until August 21, 2023.

5.     Indeed, Mr. Fackrell did not receive any medical care or attention until his condition was so serious that he had to be admitted to Union Hospital in Terre Haute, Indiana ("Union Hospital") in critical condition.  Approximately one day after his admission, Mr. Fackrell was intubated for impending respiratory failure.  Once intubated, Mr. Fackrell was also sedated and medically paralyzed.

6.     During his hospitalization, even when he was experiencing an acute medical crisis and even when he was on life support and medically paralyzed, BOP staff applied hard restraints to Mr. Fackrell's wrists and ankles.

7.     Because the BOP waited until he was critically ill, in the midst of complete psychosis, and experiencing severe and involuntary muscle rigidity before seeking medical care, and because BOP staff improperly applied hard restraints to his wrists and ankles during his hospitalization, Mr. Fackrell suffered severe and permanent nerve and muscle injuries and he continues to experience debilitating injuries and pain in his back, shoulders, arms, and hands.

8.     Mr. Fackrell's health care providers at Union Hospital and his own BOP physician agreed that Mr. Fackrell would need months of aggressive physical and occupational therapy to recover from the injuries caused during his hospitalization, and he was transferred to the United States Medical Center for Federal Prisoners in Springfield, Missouri ("MCFP-Springfield") to receive it.

9.     However, instead of providing the prescribed treatment, MCFP-Springfield staff further neglected Mr. Fackrell's health.  Mr. Fackrell's pain medication was cut abruptly and he was provided limited hands-on physical therapy sessions

2

during the four months he spent at the BOP facility—and none until nearly two months after his transfer.  As a result, Mr. Fackrell lost the opportunity to recover during a critical period of time.

10.   In sum, what was a treatable illness was ignored at length by BOP employees, and that neglect and ensuing mistreatment of Mr. Fackrell severely exacerbated that illness to the point that he had to be put on life support to survive and suffered entirely avoidable and permanent injuries.  Thereafter, the BOP denied Mr. Fackrell the treatment he needed to recover from the pain and injuries caused by the BOP's mistreatment.

11.   Today, Mr. Fackrell lives with constant pain and impaired mobility in his upper extremities.  And because he is sentenced to spend the rest of his life in BOP custody, he also lives in fear that BOP staff will one day again neglect to provide timely and proper medical care and, in so doing, potentially let him die.

## JURISDICTION AND VENUE

12.   This Court has jurisdiction over this action pursuant to Title 28 U.S.C. § 2671, *et seq.* (the "FTCA") and Title 28 U.S.C. § 1346(b)(1).

13.   Mr. Fackrell filed an administrative claim with the BOP, North Central Regional Office on July 31, 2025.  Ex. A, Administrative Claim for Damages Under the FTCA; Ex. B, BOP Confirmation of Receipt of Administrative Claim.[1]

14.   On February 10, 2026, the BOP provided Mr. Fackrell with a final denial of his claim under 28 C.F.R § 14.9, informing him that he may file suit in the appropriate district court no later than six months from the mailing of that notification.  Ex. C, BOP

---

[1] The letter sent by the BOP acknowledging receipt of Mr. Fackrell's FTCA claim contains a typo in the date.  While the letter is dated 07-07-2025, the letter acknowledges correctly that Mr. Fackrell's claim was received on 07-31-2025.

Final Denial of Administrative Claim.  Accordingly, Mr. Fackrell has exhausted all potential administrative remedies.

15.    Venue is proper in the United States District Court for the District of Colorado pursuant to 28 U.S.C. § 1402(b), which provides that any civil action on a tort claim against the United States may be prosecuted in the judicial district where the plaintiff resides.  Mr. Fackrell currently resides in the State of Colorado, where he is incarcerated at the United States Penitentiary, Administrative Maximum Facility in Florence, Colorado ("ADX-Florence").

16.    While the events described below occurred in Indiana and Missouri, all of Mr. Fackrell's medical and institutional records travelled with him from those states to Colorado when the BOP transferred him to ADX-Florence.

## PARTIES

17.    At the time of the events giving rise to this Complaint, Mr. Fackrell was incarcerated at USP-Terre Haute and MCFP-Springfield.  Mr. Fackrell's BOP inmate number is 12324-081.  Mr. Fackrell was transferred to ADX-Florence in September 2025.

18.    Defendant United States of America is the appropriate defendant under the FTCA.  28 U.S.C. §§ 1346(b), 2671, *et seq.*

19.    All federal officers referenced directly or indirectly in this Complaint were at all relevant times employees of the United States, working within the scope and course of their employment with the BOP.

## STATEMENT OF FACTS

### I.    USP-Terre Haute: August 2023

20.    In summer 2023, Mr. Fackrell was incarcerated on death row at USP-Terre Haute, where he had been housed since June 2018.  Mr. Fackrell was housed

4

in Unit A-Upper of the Special Confinement Unit (the "SCU") of the prison in August 2023. He was one of only two inmates in Unit A-Upper at that time.

21. Upon information and belief, the SCU at USP-Terre Haute was staffed by approximately six corrections officers, with one officer assigned to each of the six sub-units or "ranges" of the SCU. The corrections officer assigned to Unit A-Upper of the SCU conducted mandatory rounds twice per hour on an irregular schedule, with no more than 40 minutes between all observations. *See* BOP Program Statement 5500.14, Correctional Services Procedures Manual, Section 310. During rounds, staff were required to "observe all inmates confined in continuous locked down status," as Mr. Fackrell was at all relevant times. *Id.* BOP policy requires that all observations made during rounds be documented, and states "[c]loser observation may be required for an inmate who . . . demonstrates unusual or bizarre behavior." *Id.*

22. Thus, a corrections officer came to Mr. Fackrell's cell and observed him at least forty-eight times a day, every day, during the summer of 2023.

23. In addition to interactions and observations during rounds, corrections officers also interacted with Mr. Fackrell three times a day during meal deliveries, and multiple officers would have interacted with Mr. Fackrell any time he left his cell, including for recreational time, to use the law library, and to receive legal visits. Furthermore, the duty officer assigned to the SCU came to Mr. Fackrell's cell once a day.

24. Moreover, a correctional counselor typically visited each unit of the SCU once every weekday to handle legal mail, schedule legal and social calls, or manage other types of requests.

25.    In August 2023, Mr. Fackrell was receiving medication that required nursing staff to visit his cell twice each day—once every morning and once every evening.

26.    Once a week, every head of every department in the prison—including but not limited to the warden, associate wardens, and the head of medical care— visited every unit of the entire facility, including Unit A.

27.    Mr. Fackrell has no memory of his experiences from approximately the beginning of August until approximately September 6, 2023.  This period of amnesia is a symptom of the illness that resulted in Mr. Fackrell's emergency hospitalization in August 2023 that nearly cost him his life, which his medical providers determined was most likely neuroleptic malignant syndrome.  Mr. Fackrell's understanding of the events that transpired during this period of time comes from his institutional records, hospital records, and conversations he and others have had with people who interacted with him at that time.

28.    Starting on or around August 10, 2023, Mr. Fackrell began to experience vivid hallucinations and periods of psychosis.  He did not know where he was, how old he was, or to whom he was talking.  He talked to people who were not there, demanded corrections officers give him a cell phone so he could call his father to pick him up (oblivious to the circumstances of his confinement), persistently misidentified people he knew well, and believed he was playing a character in a video game.  When corrected, he would sometimes regain his sense of reality for a minute or two, before quickly reverting to his delusional state.

29.    During this time, Mr. Fackrell experienced difficulty urinating, difficulty drinking, and decreased physical activity.  He lost a precipitous amount of weight, and

his skin began to look yellowish and pale. He also became uncharacteristically talkative, sometimes seemingly unable to stop talking.

30. Mr. Fackrell's deteriorating condition was so alarming that multiple fellow inmates at USP-Terre Haute with Mr. Fackrell reached out to their own legal counsel to share their concerns about Mr. Fackrell's health.

31. Corrections officers were aware of Mr. Fackrell's rapidly deteriorating condition and discussed his symptoms and behavior with other incarcerated individuals at USP Terre Haute.

32. But despite being visibly unwell for no fewer than 11 days or more than 500 contacts with BOP personnel, Mr. Fackrell was not evaluated by a clinician until the afternoon of August 21, 2023. Ex. D, Clinical Encounter Administrative Note, Aug. 21, 2023. Clinical staff noted that another inmate who occupied a cell down the hall from Mr. Fackrell informed her that "Fackrell has not been right for weeks now and it is getting progressively worse." *Id.* However, BOP medical staff still did not immediately seek more intensive medical care, notwithstanding their awareness of Mr. Fackrell's alarming symptoms. Instead, they just ordered bloodwork and noted that a physician would follow up the next day. *Id.*

33. At the time of that evaluation, corrections officers acknowledged Mr. Fackrell's declining condition and obvious mental deterioration, stating that he was "talking on a pretend cell phone to a girlfriend he hasn't had in years," and that he "was unaware he was in Indiana, and believed he wasn't in prison and was in another state." *Id.* They did not, however, explain why medical assistance had not previously been sought or provided, given Mr. Fackrell's disturbing and persistent symptoms.

34. The next morning, August 22, 2023, Mr. Fackrell collapsed in the recreation yard and began to experience full body spasms. BOP staff reluctantly

agreed to seek medical care for Mr. Fackrell only after another inmate at USP-Terre Haute refused to be removed from the yard unless Mr. Fackrell received treatment.

35.     The officers who arrived to attend to Mr. Fackrell came armed with riot gear.  They placed Mr. Fackrell in metal handcuffs and ankle chains, despite his obvious medical crisis.  An officer pressed his riot shield into Mr. Fackrell as he was spasming on the ground in the recreation yard.

36.     The officers' use of force against Mr. Fackrell in the recreation yard violated BOP policy, which does not permit the use of force against an inmate unless that inmate appears dangerous.  BOP Program Statement 5566, Use of Force Policy, at 1.  Mr. Fackrell was in the midst of a debilitating medical crisis; he was not displaying signs of imminent violence.

37.     Furthermore, corrections officers violated BOP policy by failing to document their use of force, as no such documentation is included in Mr. Fackrell's central file.[2]  *See id.* at 18; 28 CFR §§ 552.22(j), 552.27.

38.     Mr. Fackrell was then evaluated by BOP medical staff for only the second time during his at least twelve-day medical crisis at 11:50 am on August 22, 2023.  He failed the medical staff's cognitive evaluation; he did not know what year or month it was, could not recall words the clinician asked him to remember, and was unable to concentrate.  Ex. E, Clinical Encounter, Aug. 22, 2023.  Medical staff

---

[2] Mr. Fackrell's counsel submitted FOIA request 2026-04890 to the BOP April 29, 2026, seeking all records contained in Mr. Fackrell's central file.  Counsel for Mr. Fackrell corresponded with the BOP and ultimately agreed to narrow the request to all "incident/use of force/Form 583 reports or other documentation regarding staff or inmate interactions with Mr. Fackrell" during the period of July 2023 through September 2023.  On June 10, 2026, the BOP responded that, after a thorough search, no responsive records were found and that no exemptions were being invoked to withhold information in response to the request

reported that his speech was racing, and his thoughts were incomplete. *Id.* During their evaluation, medical staff also noted Mr. Fackrell's significant weight loss. *Id.*

39.    During this medical evaluation, corrections officers again provided medical personnel with detailed reports of Mr. Fackrell's declining health over the prior two-week period, stating that Mr. Fackrell had "been experiencing cognitive changes and changes in physical activity for approximately last 12 days." *Id.* But despite that awareness of Mr. Fackrell's deteriorating mental and physical state, Mr. Fackrell's medical records reveal that BOP staff had not sought medical care for Mr. Fackrell until August 21, 2023. Indeed, medical records obtained from the BOP do not include a single document or note indicating Mr. Fackrell received medical care or attention between August 10 and August 21, during which corrections staff admit he was noticeably ill.

40.    Two and a half hours later, at 2:27 pm on August 22, 2023, Mr. Fackrell was admitted to Union Hospital for treatment. Union Hospital is only three miles from USP-Terre Haute, and no explanation for the delay in delivering Mr. Fackrell to the hospital appears in his medical records.

## II.    Union Hospital: August to September 2023

41.    By the time Mr. Fackrell was admitted to Union Hospital on August 22, 2023, he was in critical condition.

42.    Medical records reveal that he was also terrified. Psychotic and fearful, Mr. Fackrell told medical staff he believed he was going to be killed. He believed he was under attack, and he hallucinated visions of the electric chair. Ex. F, Critical Care Consult Note, Aug. 23, 2023, at 1. Although Mr. Fackrell has been housed at USP-Terre Haute during a period of time in 2020 and 2021 when thirteen people were executed, USP-Terre Haute does not use an electric chair for executions.

43. Upon admission to Union Hospital, Mr. Fackrell was also experiencing intense full-body muscle contractions and uncontrollable shakes. See Ex. G, Internal Medicine Note, Sept. 14, 2023, at 1.

1. Mr. Fackrell continued to rapidly decline. His speech became incomprehensible. Ex. F, Critical Care Consult Note at 8, Aug. 23, 2023, at 1. The morning of August 23, 2023, a neurologist noted that he was awake, but that he did not make eye contact, was nonverbal, and could not follow commands. Ex. H, Neurology Staff Initial Consult, Aug. 23, 2023.

2. By 5:21pm on August 23, 2023—less than 27 hours after he was admitted to Union Hospital—Mr. Fackrell's doctors made "an emergent decision to intervene and intubate [him] for impending respiratory failure." Ex. F, Critical Care Consult Note, Aug. 23, 2023, at 8.

3. Mr. Fackrell's laboratory tests revealed he was significantly acidotic with elevated creatine phosphokinase ("CPK"), an enzyme that is produced when the body breaks down muscle tissue. Doctors suspected he was experiencing rhabdomyolysis, or muscle death, from the immense exertion his body experienced during the peak of his psychosis and muscle spasms.

4. The high levels of CPK that Mr. Fackrell experienced caused acute injury to Mr. Fackrell's kidneys. Ex. I, Nephrology Consult Note at 2, Aug. 23, 2023.

5. By August 28, 2023, Mr. Fackrell no longer required a ventilator to support his breathing, and his sedation was reduced. But Mr. Fackrell's earliest memories of his hospitalization do not begin until approximately September 6, 2023.

6. In addition to directly causing the severity and extent of Mr. Fackrell's illness and injuries due to their failure to seek proper and timely medical care, BOP

employees prevented Union Hospital medical staff from properly treating and diagnosing Mr. Fackrell by failing to provide timely approval for medical treatment.

7.      Mr. Fackrell's medical records indicate that doctors were waiting for clearance from the BOP to move forward with important testing and treatment even five days after he arrived at Union Hospital.  Ex. J, Neurology Consult Note, Aug. 27, 2023.  There are multiple notations in his medical records making clear that at various times Mr. Fackrell had not received tests that his medical team ordered as part of his course of treatment, including an MRI, a head CT, a lumbar puncture, and an EEG, all important diagnostic tools that could have provided insight into his condition and expedited his care.  In fact, it appears from his medical records that Mr. Fackrell never received a lumbar puncture or an MRI of his brain.

8.      Mr. Fackrell's medical records repeatedly document that during his time at Union Hospital, he was placed in hard restraints in a four-point position and that those restraints were ordered by corrections officers and their lieutenants.

9.      Contrary to BOP policy and relevant federal regulations, there are no records documenting the use of restraints during this time in Mr. Fackrell's central file. 28 CFR §§ 552.22(j), 552.27.

10.      The restraints caused serious injuries to Mr. Fackrell immediately.  After being in the hospital for only one day, the skin on his ankles and wrists split and tore from pressing against hard restraints, including at various times metal handcuffs and hard plastic ties.  Ex. K, Wound Care Note, Aug. 23, 2023.

11.      A provider's notes state that Mr. Fackrell was "on four-point restraint for almost 7 days" starting from the beginning of his admission.  Ex. L, Provider Progress Notes, Sept. 12, 2023, at 1.  Notably, Mr. Fackrell was intubated, sedated, and medically paralyzed from the second through the sixth days of his admission.  Thus,

even while on life support and unable to move, BOP officers continued to restrain Mr. Fackrell improperly by his already injured hands and feet.  *See* Ex. M, Neurology Staff Progress Note, Aug. 24, 2023.

12.   The use of hard restraints during medical treatment was in violation of the BOP's policy regarding the use of restraints, which states that in circumstances where the continued use of restraints is necessary, "hard restraints . . . are to be used only after soft restraints have proven ineffective or the inmate has a documented history of defeating soft restraints."  BOP Program Statement 5566, Use of Force Policy, at 10-11; 28 CFR § 552.24(a).

13.   Soft restraints used by the BOP are typically made of thick bands of leather or vinyl, which would not have cut into Mr. Fackrell's skin.

14.   Mr. Fackrell's records do not indicate that BOP staff attempted to use soft restraints—and thus they could not have proven ineffective—and Mr. Fackrell has no history of defeating restraints of any kind.  Mr. Fackrell's medical records also do not document any attempts by BOP staff to restrain Mr. Fackrell using soft restraints.

15.   BOP policy requires that inmates placed in four-point restraints be assessed by qualified health personnel to "ensure appropriate breathing and response (physical or verbal)," qualified health personnel are to "visit the inmate at least twice during each eight hour shift," and the use of restraints for more than 8 hours requires the supervision of a healthcare provider.  28 CFR § 552.24(f).

16.   While Mr. Fackrell was in a hospital and being treated by healthcare providers while restrained at Union Hospital, neither his medical records nor central file records indicate that qualified health personnel assessed his restraints or the impact of those restraints on his health and well-being.  28 CFR §§ 552.22(j), 552.27. Those records also offer no indication that efforts were made to restrain Mr. Fackrell

in a way that would have been less harmful, despite the obvious and immediate injuries the hard restraints were causing.

17. BOP staff are also required to check an inmate who is in four-point restraints every 15 minutes "to ensure that the restraints are not hampering circulation and for the general welfare of the inmate." 28 CFR §552.24(d).

18. There is no documentation in Mr. Fackrell's medical records or central file indicating BOP staff ever assessed the impact the restraints were having on Mr. Fackrell's circulation and welfare.  28 CFR §§ 552.22(j), 552.27.

19. Furthermore, BOP policy requires the Warden or institution administrative duty officer to notify the Regional Director or Regional Duty Officer by phone when an inmate is restrained for more than 8 hours.  28 CFR § 552.24(g).

20. In violation of BOP policy, there are no records in Mr. Fackrell's central file that document that such notices were given to the Regional Director or Regional Duty Officer.  28 CFR §§ 552.22(j), 552.27.

21. The continued use of four-point restraints while Mr. Fackrell was intubated, sedated, and medically paralyzed was in violation of BOP policy, which requires that BOP staff consider lesser restraints or removing restraints once an inmate "is no longer a disruptive threat."  BOP Program Statement 5566, Use of Force Policy, at 15.

22. As his mental faculties returned, Mr. Fackrell quickly realized that something was terribly wrong with his hands, arms, shoulders, and back.  He could barely lift his arms from the bed, he could not close his hands, his hands and arms were numb, and he was experiencing significant pain.

23. After being evaluated by a neurosurgeon, orthopedic surgeon, and shoulder specialist, it was determined that Mr. Fackrell suffered a profound injury to

the system of nerves that run from the neck and spine through the shoulder and which are responsible for movement and control of the arm and hand.  This type of traumatic injury—which is called a brachial plexus injury—is caused when nerves are stretched, squeezed, or torn from the spinal cord.

24.     A test of the electrical activity of the muscle and nerve cells in Mr. Fackrell's right upper extremities showed "multiple nerve lesions to the brachial plexus and peripheral nerves," including a "profound right axillary nerve lesion with no motor unit activity in the deltoid muscle," "moderate to severe lower trunk lesion vs medial cord lesion cause significant weakness of [Mr. Fackrell's] hand muscles and numbness of [his] pinky and forearm," "mild to moderate right upper trunk lesion causing right shoulder numbness and weakness," "mild to moderate right median and ulnar neuropathy at the wrist," and "mild ulnar neuropathy at the right elbow."  Ex. N, EMG Report, Sept. 14, 2023, at 2.  An MRI conducted on September 19, 2023 showed "signs of myositis and significant disruption of the shoulder girdle muscles."  Ex. O, Internal Medicine Progress Note, Sept. 19, 2023, at 1.

25.     Essentially, the muscles and nerves in Mr. Fackrell's shoulders, neck, and arms were stretched and torn by how hard he spasmed and fought against the restraints that were improperly applied by BOP employees.

26.     Clinical staff wrote that Mr. Fackrell's injuries were likely caused by his "fighting the restraints on the night of admission," Ex. P, Internal Medicine Progress Note, Aug. 29, 2023.

27.     Had BOP staff sought timely medical care for Mr. Fackrell instead of waiting until he was critically ill and experiencing psychosis and involuntary muscle rigidity, these injuries would not have occurred.

28.     Had BOP staff properly restrained Mr. Fackrell using methods and positioning that were safe and appropriate for his medical condition, these injuries would not have occurred.

29.     Mr. Fackrell's medical team at Union Hospital came to believe that the most likely cause of his initial symptoms was neuroleptic malignant syndrome caused by an interaction between his medications.  Neuroleptic malignant syndrome causes altered mental status, muscle rigidity, excessive sweating, and elevated CPK—all symptoms Mr. Fackrell suffered.  Mr. Fackrell's condition improved when he was taken off medications that are known to cause neuroleptic malignant syndrome.

30.     After spending one month at Union Hospital, Mr. Fackrell ultimately asked to return to USP-Terre Haute.

31.     He had not been permitted to shower during his month-long stay at Union Hospital.  Instead, he was given only a bathing wipe to clean himself, which he was unable to use because of the loss of function in his arms.

32.     His legs were constantly shackled, and at all times there were at least two armed guards in his room.

33.     Before deciding to leave Union Hospital, Mr. Fackrell was informed by his medical team, which was in communication with his primary doctor at USP-Terre Haute, that he would have continued access to pain medication and would be given a resistance band to improve the function of his arms upon his return to USP-Terre Haute.

III.     USP-Terre Haute: September to October 2023

34.     Mr. Fackrell was transferred to USP-Terre Haute on September 21, 2023.

35. At that time, there was an ongoing malfunction of the locking mechanisms on cell doors in the SCU. As a result, Mr. Fackrell was moved, along with everyone else housed in the SCU, to a different housing unit within USP-Terre Haute.

36. Mr. Fackrell's access to his pain medication was immediately disrupted upon his return. To continue receiving oxycodone/acetaminophen tablets, which he had been prescribed and given at Union Hospital, Mr. Fackrell was required to be seen by a doctor by September 24, 2023, three days after his return to USP-Terre Haute.

37. On September 24, 2023, a registered nurse facilitated an order to renew that medication for another three days, until September 27, 2023.

38. Mr. Fackrell still had not been seen by a doctor on September 27, 2023, and so he was no longer able to receive oxycodone/acetaminophen tablets. His nurse instead put in an order for seven days' worth of ibuprofen, informing Mr. Fackrell that he would "need to purchase from commissary after seven-day supply is up." Ex. Q, Clinical Encounter Note, Sept. 27, 2023, at 1.

39. By October 3, 2023, Mr. Fackrell was no longer receiving any form of pain medication from the BOP—despite the severity of his injuries and extent of his suffering—because no doctor had seen him since he returned from Union Hospital.

40. Medical records indicate that Mr. Fackrell was not evaluated by a doctor at USP-Terre Haute until October 4, 2023, more than two weeks after his return. During that visit, Mr. Fackrell's provider re-prescribed oxycodone/acetaminophen and prescribed gabapentin (a treatment for nerve pain) and baclofen (a muscle relaxer).

41. On at least one occasion before October 4, 2023, BOP staff prevented Mr. Fackrell's doctor from evaluating him.

42.     Between September 21, 2023 and October 10, 2023 at USP-Terre Haute, Mr. Fackrell's pain intensified rapidly.  While he experienced more numbness than pain in his arms and hands while at Union Hospital, the pain in his arms, shoulders, and back soon became unbearable.

43.     Moreover, BOP staff at USP Terre-Haute did not provide Mr. Fackrell with the promised resistance band to use for physical therapy exercises, and he was never seen by a physical or occupational therapist.

### IV.     Union Hospital: October 2023

44.     Mr. Fackrell's primary care physician eventually recommended that he return to Union Hospital because there was no physical therapist available at USP-Terre Haute and Mr. Fackrell needed physical therapy to recover from his injury.

45.     While at Union Hospital, from October 11, 2023 through October 20, 2023, he was given daily, hands-on physical and occupational therapy.  During those physical therapy sessions, Mr. Fackrell wore restraints on his legs, but neither of his hands or arms were restrained.

46.     Unlike during his initial stay at Union Hospital, at no time during Mr. Fackrell's October 2023 hospital stay were any guards assigned to his room. Furthermore, Mr. Fackrell's arms were never restrained when he was in his hospital room, and his leg restraints were such that he was able to get out of and move a short distance around his bed.

47.     Mr. Fackrell's medical providers at USP-Terre Haute and Union Hospital agreed he would need long-term and intensive treatment to recover.  *E.g.,* Ex. R, Clinical Encounter Note, Oct. 19, 2023, at 1 ("Neurosurgery has signed off on the case and suggested intensive PT/OT (which he is receiving at the hospital currently) . . . therefore, the treatment plan is OT.").

17

48.     Mr. Fackrell's doctors at Union Hospital and USP-Terre Haute advocated for his transfer to MCFP-Springfield, though their clinical notes document apparent delays and "confusion" involving Mr. Fackrell's transfer to the prison hospital, and he was not initially moved despite having been approved for transfer.  Ex. S, Clinical Encounter Note, Oct. 19, 2023, at 1; Ex. T, Clinical Encounter Note, Oct. 4, 2023, at 3 (documenting efforts to "facilitate an emergent 770 transfer to the Federal Medical Center for follow-up of [. . .] the brachial stretch injury and the need for intensive daily physical therapy.").

49.     MCFP-Springfield did ultimately approve his transfer, and on October 20, 2023, the BOP relocated Mr. Fackrell to MCFP-Springfield.

**V.     MCFP-Springfield: October 2023 to February 2024**

50.     When he arrived at MCFP-Springfield, Mr. Fackrell faced a long path to recovery—at least three to six months according to the doctors at Union Hospital and his doctor at USP-Terre Haute.  Both Mr. Fackrell's doctor at USP-Terre Haute and his specialists at Union Hospital provided medical opinions that his recovery would require intensive daily physical therapy.

51.     However, once at MCFP-Springfield, Mr. Fackrell did not receive the treatment he needed.  Instead, MCFP-Springfield staff immediately discontinued the daily hands-on physical therapy Mr. Fackrell had been receiving while at Union Hospital.

52.     At MCFP-Springfield, Mr. Fackrell's primary form of treatment was a home exercise program, which consisted only of a sheet of paper describing exercises one could, theoretically, do on their own.  This type of self-guided, home exercise program was plainly not what Mr. Fackrell's medical providers at Union Hospital and USP-Terre Haute determined he needed when they concurred that his treatment

should consist of intensive physical therapy at MCFP-Springfield, as he could have been given sheets of paper and instructed to do exercises on his own anywhere.

53. Despite his desire to improve and willingness to participate in therapy, Mr. Fackrell's injuries, weakness, and pain prevented him from completing the self-guided home exercises without assistance.

54. MCFP-Springfield staff did not give Mr. Fackrell hands-on assisted physical therapy until December 7, 2023—nearly two months after he arrived at this BOP facility.

55. Although Mr. Fackrell received hands-on physical therapy without arm restraints during his October stay at Union Hospital without any security incidents occurring, Mr. Fackrell received only a few hands-on physical therapy sessions during the four months he spent at MCFP-Springfield. He was permitted to have one arm free from restraints during those sessions, and each session occurred without any security-related incidents.

56. Mr. Fackrell's pain management regimen was also materially changed when he was transferred to MCFP-Springfield. The day that Mr. Fackrell arrived at the facility, MCFP-Springfield abruptly cut his pain management treatment, and as a result, Mr. Fackrell experienced constant and intense pain. *See* Ex. U, Clinical Encounter Note, Oct. 24, 2023.

57. Inadequate pain management also diminished Mr. Fackrell's ability to engage meaningfully in physical and occupational therapy exercises, as his unmanaged pain prevented him from exercising according to his home exercise program without assistance.

58. Due to MCFP-Springfield's grossly inadequate care, Mr. Fackrell developed a condition referred to as Frozen Shoulder. The muscle in the upper part

of his right arm developed scarring that caused it to tighten, stiffen, and shift down and away from his shoulder. His muscle atrophied and what remained of it developed fibrosis.

59. Upon information and belief, staff at MCFP-Springfield were collectively engaged in a campaign to make his conditions so unbearable that he would request a transfer. While being processed on the day he arrived, Mr. Fackrell was told by a lieutenant that MCFP-Springfield did not want him there, that efforts had been made to reject his transfer, and that he should not expect to stay long.

60. Rather than provide medical and custodial care, BOP staff repeatedly encouraged Mr. Fackrell to sign a form requesting a transfer back to USP-Terre Haute and falsely state that he did not need the intensive physical therapy he was sent to MCFP-Springfield to receive.

61. MCFP-Springfield staff also regularly downplayed the severity of Mr. Fackrell's injuries in their clinical notes.

62. Moreover, certain other aspects of Mr. Fackrell's conditions at MCFP-Springfield exacerbated his pain and suffering and exposed him to additional health complications.

63. For example, Mr. Fackrell was not given or permitted to have proper shoes during the four months he was housed at MCFP-Springfield. He was not even given shower shoes for a month, and he was required to purchase those from the commissary. Being forced to go without appropriate, supportive footwear caused Mr. Fackrell intense back pain.

64. Mr. Fackrell's cell was dirty, as was the shower inside his cell. And because of the loss of function in his arms and hands, Mr. Fackrell was unable to clean his space using the supplies he was given by BOP staff. BOP staff provided no

assistance in sanitizing Mr. Fackrell's cell.  As a result, Mr. Fackrell developed several toe infections that plagued him for months.

65.    Mr. Fackrell was also given only a safety paper spoon with which to feed himself.  Staff ignored his requests for meals he could more easily feed himself, like sandwiches.  Unable to use his arms and hands to properly feed himself with the paper spoon, Mr. Fackrell continued to lose an unhealthy amount of weight.

66.    Mr. Fackrell came to MCFP-Springfield trending towards recovery.  Mr. Fackrell left MCFP-Springfield a little more than four months later, on February 5, 2024, having regressed, with his chance of a full recovery severely diminished.

67.    Upon his return to USP-Terre Haute, even Mr. Fackrell's medical providers were struck by the lack of treatment he received at MCFP-Springfield.  Mr. Fackrell's primary care physician at USP-Terre Haute wrote in a clinical note upon his return that "[Mr. Fackrell] was sent [to MCFP-Springfield] for intensive occupational therapy and physical therapy.  The patient states this really did not happen upon his arrival to federal medical center and during his time there.  This was the primary reason he was sent."  Ex. V, Clinical Encounter Note, Feb. 9, 2024, at 1.  *See also id.*, at 5.

68.    Mr. Fackrell has never received the intensive or aggressive physical or occupational therapy that his medical providers at Union Hospital and USP-Terre Haute agreed he would need in order to recover.

69.    After returning to USP-Terre Haute, Mr. Fackrell was eventually provided with limited hands-on physical therapy sessions once a week, during which his physical therapist would stretch his arm and shoulder.  The physical therapist who eventually worked with Mr. Fackrell at USP-Terre Haute often had to use his entire body weight to assist Mr. Fackrell with those stretches because of the severity of the

muscle tightness caused by Mr. Fackrell's injuries. Mr. Fackrell typically did not wear any arm restraints during those sessions, and there were never any security incidents.

70. The physical therapy sessions that Mr. Fackrell received at USP-Terre Haute were discontinued around February 2025, but during the time he was receiving treatment, Mr. Fackrell experienced improvement in the function of his arms and a reduction in his pain.

## DAMAGES

71. Every aspect of Mr. Fackrell's daily life has been harmed by BOP staff's negligent and substandard treatment.

72. He continues to experience constant pain and discomfort in his arms, shoulders, and back. Mr. Fackrell feels relentless stabbing and radiating pain in his right shoulder and right arm. Movement intensifies that pain. His right forearm and hand are afflicted with a sharp, shooting pain. He also feels the sensation of needle pricks in his right hand. The middle of his back aches, intermittently spasming and locking up. Mr. Fackrell's left shoulder aches when it bears any amount of weight. Unless he constantly moves it, Mr. Fackrell's left hand stiffens so that moving it again is painful and difficult.

73. Because of his injuries, Mr. Fackrell is not able to sleep on his back or right side for any significant amount of time. Because he must sleep on his left side, and because his pain makes it difficult to sleep, Mr. Fackrell wakes frequently and typically sleeps only around three hours per night.

74. He has frequent nightmares and nearly nightly bouts of sleep paralysis, a condition he never experienced prior to August 2023.

75. Mr. Fackrell's injuries have caused and continue to cause him persistent and debilitating pain, which has been worsened by the BOP's denial of appropriate

22

physical and occupational therapy.  As a result, he has required treatment by pain medication that itself causes suffering in the form of significant side effects and has symptoms of withdrawal when the medication is either not available, provided outside of the prescribed schedule, or when the dosage is reduced.

76.    Mr. Fackrell's vision has also been affected by the medical events described above.  Ever since his hospitalization in August and September 2023, he sees bright, distracting circles in his field of vision.  In May 2024, Mr. Fackrell was seen by an ophthalmologist who informed him that his vision changes were likely caused by the medical emergency he endured in August 2023, and that he would need treatment by a neurologist.  The BOP has not provided Mr. Fackrell with a consultation with a neurologist, despite his ophthalmologist's recommendation.

77.    Mr. Fackrell has had to teach himself to write and brush his teeth with his left hand.

78.    Before his illness and injury Mr. Fackrell was an avid reader.  He now struggles to read because of the problems with his vision and because his back, shoulder, arm, and hand injuries make it difficult to sit still or hold a book for an extended time.

79.    Mr. Fackrell's injuries have at times limited his ability to care for himself, including, for example, making it difficult to get dressed or shave his face.

80.    Mr. Fackrell is hesitant to take new medications, as he is afraid that he may become sick again, and—should the BOP again completely neglect and improperly respond to his condition—potentially die.  Mr. Fackrell lives with the anxiety of knowing that the BOP chose to withdraw necessary and important medical care before, as it did at MCFP-Springfield, and he fears it may do so again.

81.     In 2018, Mr. Fackrell underwent surgery to have a hiatal hernia repaired. His hernia has since returned, and he will likely undergo another surgery to repair what is now a more severe and painful medical issue.  The extreme exertion that Mr. Fackrell experienced while sick and convulsing in August 2023 could have caused his hiatal hernia to reoccur, and thus it may be the direct result of BOP employees' actions and inactions.  Complications from hiatal hernias or the repair of hiatal hernias can be dangerous and even life-threatening.

82.     The acts and omissions of BOP staff have also placed Mr. Fackrell at exceptionally high risk of future harm.  Mr. Fackrell is sentenced to serve the remainder of his natural life in prison.  For the rest of his life, he will have no control over his medical care and will be entirely reliant on the BOP to provide the treatment he will require to manage his lasting injuries.

## CAUSES OF ACTION

## COUNT I – NEGLIGENCE

83.     Mr. Fackrell re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

84.     BOP staff have a statutory obligation to provide for the "safekeeping, care, and subsistence" of prisoners in their custody.  18 U.S.C. § 4042(a)(2).  These include duties to seek and provide medical care when appropriate, to provide inmates with a safe environment, and to approve care at the hospital.

85.     At all relevant times, BOP staff and employees acting within the scope of their employment at USP-Terre Haute owed Mr. Fackrell a duty of reasonable care as his custodians.

86.     BOP staff of USP-Terre Haute failed to fulfill their non-discretionary duties of care by failing to promptly seek medical care for Mr. Fackrell.

87.     Although his symptoms started no later than August 10, 2023, Mr. Fackrell was not medically evaluated by BOP clinicians until August 21, 2023, and he was admitted to Union Hospital in critical condition only one day later.

88.     Corrections officers repeatedly informed BOP clinicians and hospital staff *after the fact* that they had been aware of Mr. Fackrell's declining physical and psychological condition for weeks.  Furthermore, the sheer number of individuals who interacted with Mr. Fackrell on a daily basis, often multiple times throughout the day, guarantees that an undetermined but significant number of BOP staff members were aware of his alarming and obvious symptoms.  As stated above, Mr. Fackrell was observed by corrections officers no less than 48 times every day.  He received medication directly from clinical staff twice a day, and he frequently interacted with other BOP staff including counselors, duty officers, and the heads of departments.  But Mr. Fackrell's records indicate no efforts were made to seek medical care for Mr. Fackrell from the onset of his symptoms—which was not later than August 10, 2023—until August 21, 2023.

89.     All BOP staff members who failed to seek medical services for Mr. Fackrell when he was in obvious and urgent need of care in August 2023 violated their non-discretionary duties of care by failing to promptly seek medical care for Mr. Fackrell.

90.     Had Mr. Fackrell received medical treatment before his illness progressed to the point that he was in critical condition—which required that he be placed on life support within only 27 hours of his hospitalization—and in a state of psychosis, all or most of his injuries would have been avoided entirely, and the rest would have been substantially diminished.

91. Corrections officers at USP-Terre Haute also violated their non-discretionary duties to Mr. Fackrell by improperly restraining Mr. Fackrell during his medical emergencies.

92. When Mr. Fackrell suffered a serious medical crisis while in the recreational area of USP-Terre Haute on August 22, 2023, corrections officers first ignored him and then responded with an unjustified and excessive use of force. Even though Mr. Fackrell had collapsed to the ground and was experiencing full body spasms, corrections officers restrained him using hard restraints and pressed a riot shield into his body.

93. When Mr. Fackrell arrived at Union Hospital, corrections officers restrained him to his hospital bed using hard, four-point restraints. Because he was restrained improperly while he was experiencing severe psychosis and not in control of his body, Mr. Fackrell struggled intensely against the restraints.

94. Corrections officers continued to restrain Mr. Fackrell while he was intubated and medically paralyzed.

95. In restraining Mr. Fackrell in the ways described above, BOP officers violated BOP policy and caused Mr. Fackrell significant injuries. BOP Program Statement 5566, Use of Force Policy; 28 CFR §§ 552 *et seq*.

96. All BOP staff who improperly restrained and used unnecessary and excessive force against Mr. Fackrell while he was in medical distress violated their non-discretionary duties as his custodians by causing him unnecessary harm and creating an unsafe environment.

97. Employees of USP-Terre Haute also did not fulfill their non-discretionary duty of care to Mr. Fackrell by failing to provide timely authorization for medical treatment.

98.     During critical periods of time early in Mr. Fackrell's admission at Union Hospital in August 2023, his physicians noted repeatedly that they were waiting for permission from the BOP to proceed with diagnostic tests that could have provided his physicians with critical information that likely would have resulted in faster, better treatment and reduced Mr. Fackrell's long-term pain and suffering.

99.     In addition, employees of USP-Terre Haute violated their non-discretionary duties to Mr. Fackrell by failing to provide Mr. Fackrell with access to medical treatment once he returned to USP-Terre Haute in September 2023 after having been discharged from Union Hospital.

100.    During the three-week period he was housed at USP-Terre Haute in September and October 2023, Mr. Fackrell was not provided access to physical therapy, was not provided access to equipment for personal rehabilitation, like a resistance band, and because he was denied a timely evaluation by his doctor, was given inadequate pain medication and, at times, no pain medication at all.

101.    Upon arriving at MCFP-Springfield, Mr. Fackrell's meaningful physical and occupational therapy was almost completely discontinued by medical staff, and his condition regressed as a result.  That lack of treatment deprived Mr. Fackrell of the opportunity for the restoration of normal or improved function in his upper back, shoulders, arms, wrists, and hands.

102.    BOP employees at MCFP-Springfield violated their non-discretionary duty of care by actively interfering with his access to medical care by discontinuing his intensive physical therapy and abruptly and drastically reducing his pain management medication.

27

103.    BOP employees at MCFP-Springfield also violated their non-discretionary duty of care by intentionally subjecting Mr. Fackrell to conditions designed to coerce his departure from the facility.

104.    BOP employees placed Mr. Fackrell in a filthy cell he could not clean because of his physical impairments, gave him food he could not eat due to his injuries, and informed him in no uncertain terms that he was not wanted at MCFP-Springfield and that he should return to USP-Terre Haute.

105.    BOP employees' negligent acts and omissions were the direct and proximate cause of Mr. Fackrell's injuries, including but not limited to psychosis, rhabdomyolysis, deep vein thrombosis, acute kidney injury, profound brachial plexus injury, rotator cuff injury, neurological injury, lacerations and abrasions, adhesive capsulitis, muscle atrophy, muscle contraction, nerve damage, and the lasting physical, psychological, and emotional harms described herein.

106.    Mr. Fackrell has suffered and continues to suffer damages in an amount to be proven at trial.

## COUNT II - MEDICAL MALPRACTICE

107.    Mr. Fackrell re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

108.    BOP medical providers at MCFP-Springfield owed Mr. Fackrell a non-discretionary duty to use the degree of skill and learning ordinarily used by members of their profession under the same or similar circumstances and to provide care that met or exceeded the accepted medical standard.

109.    At all times when treating Mr. Fackrell, BOP medical providers were acting within the scope of their employment.

110.   Prior to his transfer to MCFP-Springfield, Mr. Fackrell's medical providers repeatedly recommended aggressive physical and occupational therapy as treatment for his injuries, and aggressive physical and occupational therapy is the standard of care appropriate for such injuries.

111.   While at Union Hospital in October 2023, Mr. Fackrell received daily hands-on assisted physical therapy without any security related incidents.   During those sessions at Union Hospital, his arms were not restrained.

112.   Mr. Fackrell was transferred to MCFP-Springfield specifically because that facility could provide physical and occupational therapy, while other BOP facilities could not.

113.   However, MCFP-Springfield staff did not give Mr. Fackrell the intensive physical and occupational therapy he was prescribed and that he was transferred to the BOP facility to receive.  In fact, he did not receive any hands-on assisted physical therapy until almost two months after he arrived and only after doctors noted that Mr. Fackrell suffered from muscle atrophy.   Even then, MCFP-Springfield staff administered hands-on assisted physical therapy only a few times in the span of four months.   Such infrequent physical and occupational therapy does not constitute aggressive or intensive treatment.

114.   MCFP-Springfield also abruptly cut Mr. Fackrell's pain management treatment upon his transfer to the BOP facility, making it impossible for him to engage in physical therapy by himself.   Throughout his time at MCFP-Springfield, Mr. Fackrell's medications would continue to be reduced and discontinued.

115.   These acts and omissions fell below the applicable standard of medical care.

116.    The acts and omissions of BOP medical providers at MCFP-Springfield directly caused or contributed to Mr. Fackrell's deterioration and lasting injury.  As a direct and proximate result, Mr. Fackrell has suffered and continues to suffer damages in an amount to be proven at trial.

## COUNT III - ASSAULT

117.    Mr. Fackrell re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

118.    BOP officers placed Mr. Fackrell in metals handcuffs and ankle chains despite his obvious medical crisis in the recreation yard at USP-Terre Haute on August 22, 2023.  An officer pressed his riot shield into Mr. Fackrell as he was spasming, his body rigid on the ground in the recreation yard.  Doing so violated BOP policy, as does the lack of documentation of this use of force in Mr. Fackrell's BOP records.

119.    In violation of BOP policy, Mr. Fackrell was placed in hard restraints in a four-point position at Union Hospital, notwithstanding that he was in a state of medical crisis and experiencing full body spasms.

120.    BOP officers continued to apply restraints, including hard restraints, to Mr. Fackrell's hands and feet even while he was on a ventilator and in a medically induced coma.

121.    Pursuant to 28 U.S.C. § 2680(h), the United States may be held liable for assault and battery claims arising from the acts of BOP corrections officers, who are "officers of the United States ... empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law."

122.    At all times when committing these actions, BOP staff were acting within the scope of their employment.

123.    As a direct and proximate result of Defendant's conduct, Mr. Fackrell suffered severe injuries to the nerves and muscles in his arms, shoulders, and back. He also suffered lacerations and abrasions to his wrists and ankles, which became infected and took months to heal.

124.    Mr. Fackrell has suffered and continues to suffer damages in an amount to be proven at trial.

### COUNT IV - BATTERY

125.    Mr. Fackrell re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

126.    BOP officers placed Mr. Fackrell in metal handcuffs and ankle chains despite his obvious medical crisis.  An officer pressed his riot shield into Mr. Fackrell as he was spasming, his body rigid on the ground in the recreation yard.

127.    In violation of BOP policy, Mr. Fackrell was placed in hard restraints in a four-point position at Union Hospital, notwithstanding that he was in a state of medical crisis and experiencing full body spasms.

128.    BOP officers continued to apply restraints, including hard restraints, to Mr. Fackrell's hands and feet even while he was on a ventilator and in a medically induced coma.

129.    Pursuant to 28 U.S.C. § 2680(h), the United States may be held liable for assault and battery claims arising from the acts of BOP corrections officers, who are "officers of the United States ... empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law."

130.    At all times when committing these actions, BOP staff were acting within the scope of their employment.

131.   As a direct and proximate result of Defendant's conduct, Mr. Fackrell suffered severe injuries to the nerves and muscles in his arms, shoulders, and back. He also suffered lacerations and abrasions to his wrists and ankles, which later became infected and took months to heal.

132.   These physical contacts were intentional, knowing, and reckless, and without Mr. Fackrell's authorization, and were conducted in an insolent and injurious manner toward Mr. Fackrell while he was in clear medical distress.

133.   As a direct and proximate result of Defendant's conduct, Mr. Fackrell suffered damages in an amount to be proven at trial.

## COUNT V - NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

134.   Mr. Fackrell re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

135.   BOP employees at USP-Terre Haute were negligent in their care and custody of Mr. Fackrell.

136.   BOP employees at MCFP-Springfield were also negligent insofar as they deliberately withheld treatment, improperly reduced pain medication, and engaged in a campaign to coerce Mr. Fackrell's departure from the facility.  This conduct was a direct and substantial factor in causing Mr. Fackrell serious emotional distress.

137.   Mr. Fackrell has frequent nightmares and nearly nightly bouts of sleep paralysis, a condition he never experienced prior to August 2023.  He is hesitant to take new medications, as he is afraid that he may become sick again and potentially die.  He lives with the anxiety of knowing that the BOP has chosen to withdraw necessary and important medical care before, and he fears it may do so again.

138.   The serious emotional distress and severe impairment of his ability to engage in normal human activities—like reading, writing, and sleeping—suffered by

Mr. Fackrell is of the type that a reasonable person would expect to occur as a result of Defendant's negligent acts and omissions.

139. At all times when committing these actions, BOP staff were acting within the scope of their employment.

140. As a direct and proximate result of the actions taken by BOP employees, Mr. Fackrell has suffered and continues to suffer damages in an amount to be proven at trial.

## COUNT VI - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

141. Mr. Fackrell re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

142. USP-Terre Haute staff intentionally or recklessly permitted Mr. Fackrell to languish in an obvious medical crisis for over eleven days without intervention.

143. MCFP-Springfield staff were collectively engaged in a campaign to make Mr. Fackrell's conditions so unbearable that he would request to leave. While being processed on the day of his arrival, Mr. Fackrell was told by a Lieutenant that MCFP-Springfield did not want him there and that he should not expect to stay long.

144. Rather than provide medical and custodial care, staff repeatedly encouraged Mr. Fackrell to sign a form requesting to transfer back to USP-Terre Haute and falsely state that he did not need the intensive physical therapy he was sent to MCFP-Springfield to receive.

145. Deliberately withholding medically necessary treatment from a gravely injured individual as part of an institutional campaign to force his departure is extreme and outrageous conduct and was undertaken intentionally or recklessly.

146. Mr. Fackrell was not provided with or permitted to have proper shoes during the four months he was housed at the medical facility. He was not even given

shower shoes for a month.  Mr. Fackrell's cell was dirty, as was the shower inside his cell.  And because of the loss of function in his arms and hands, Mr. Fackrell was unable to clean his space using the supplies provided by the staff.  Staff provided no assistance in sanitizing Mr. Fackrell's cell.  As a result, Mr. Fackrell developed toe infections that plagued him for months.

147.   Mr. Fackrell was also given only a safety paper spoon with which to feed himself.  Staff ignored his requests for meals he could more easily feed himself, like sandwiches.  Unable to use his arms and hands to properly feed himself with the paper spoon, Mr. Fackrell lost an unhealthy amount of weight.

148.   This conduct was extreme and outrageous, going beyond all possible bounds of decency and utterly intolerable in a civilized community.  BOP agents acted intentionally or recklessly.   Their conduct caused Mr. Fackrell severe emotional distress, including fear, anxiety, nightmares, sleep paralysis, and a pervasive fear of future harm.

149.   At all times when committing these actions, BOP staff were acting within the scope of their employment.

150.   As a direct and proximate result of Defendant's conduct, Mr. Fackrell has suffered and continues to suffer damages in an amount to be proven at trial.

### COUNT VII - LOSS OF CHANCE

151.   Mr. Fackrell re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

152.   Mr. Fackrell came to MCFP-Springfield trending towards recovery.  He left MCFP-Springfield a little more than four months later, having regressed, with his chance of a full recovery markedly diminished.

153.   MCFP-Springfield medical staff violated the applicable standard of care by discontinuing intensive physical therapy, drastically reducing pain management, and providing inadequate care.

154.   This breach directly and substantially reduced Mr. Fackrell's chance of a full or meaningful recovery.

155.   As a direct and proximate result, Mr. Fackrell has suffered and continues to suffer damages in an amount to be proven at trial.

### COUNT VIII - INCREASED RISK OF FUTURE HARM

156.   Mr. Fackrell re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

157.   Mr. Fackrell is serving a life sentence without the possibility of parole. The substantial injuries that Mr. Fackrell suffered, as described herein, place him at a much greater risk of injury and illness in the future.

158.   As a direct and proximate result of Defendant's negligence and given the permanent and disabling nature of his injuries, Mr. Fackrell faces a materially and demonstrably increased risk of future harm, including re-injury, infection, further loss of function, additional medical complications, and injury from violence by staff or other incarcerated individuals.

159.   MCFP-Springfield's grossly inadequate care of Mr. Fackrell significantly and demonstrably increased Mr. Fackrell's risk of future harm, including re-injury, infection, further loss of function, and additional medical complications.

160.   As a direct and proximate result, Mr. Fackrell has suffered and continues to suffer damages in an amount to be proven at trial.

**PRAYER FOR RELIEF[3]**

WHEREFORE, Mr. Fackrell respectfully requests that this Court enter judgment in his favor and against Defendant United States of America, and grant the following relief:

A.  Compensatory damages for physical pain and suffering, past and future, in an amount to be proven at trial;

B.  Compensatory damages for emotional distress, past and future, in an amount to be proven at trial;

C.  Compensatory damages for loss of quality of life and enjoyment of life, in amounts to be proven at trial;

D.  Compensatory damages for loss of future income from employment through BOP work programs, in amounts to be proven at trial;

E.  Compensatory damages for loss of chance of a better medical outcome, in amounts to be proven at trial;

F.  Compensatory damages for increased risk of future harm, in amounts to be proven at trial;

G.  Pre-judgment and post-judgment interest as permitted by law;

H.  Costs and such other and further relief as this Court would deem just and proper.

*[Remainder of page left intentionally blank.]*

---

[3] Mr. Fackrell reserves the right to request that an advisory jury be empaneled pursuant to Federal Rule of Civil Procedure 39(c).

36

Dated: August 6, 2026

*/s/Jennifer Ware-Phillips*
**WHITE & CASE LLP**
Jennifer Ware-Phillips
75 State Street, 24th Floor
Boston, MA 02109
Telephone: (617) 979-9347
jennifer.ware@whitecase.com

-and-

**WHITE & CASE LLP**
Isaac Glassman
1221 Avenue of the Americas, 48th Floor
New York, NY 10020
Telephone (212) 819-8554
isaac.glassman@whitecase.com

*Counsel for Plaintiff Ricky Fackrell*